# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LEACH FARMS, INC.,**
        **Plaintiff,**

v.                                              Case No. 14-C-0001

**RYDER INTEGRATED LOGISTICS, INC.,**
        **Defendant.**

---

## DECISION AND ORDER

In this decision and order, I address the defendant's motion for partial summary judgment.[1]

## I. BACKGROUND

The plaintiff, Leach Farms, Inc., operates a commercial farm in Green Lake County, Wisconsin, that produces celery. Leach also has a processing plant in Berlin, Wisconsin, and tries to process all of its celery crop at that plant each season. As it approached the 2013 planting season, Leach determined that it would harvest and sell more celery than it could process at its own plant. Leach began to look for an outside processing facility to handle the excess.

The defendant, Ryder Integrated Logistics, Inc., operates a plant in Beaver Dam, Wisconsin, that has the capacity to process celery. In the spring of 2013, Leach began

---

[1]The plaintiff has filed a motion to strike a portion of a declaration that the defendant submitted in support of its motion for partial summary judgment. In the alternative, the plaintiff asks to supplement the summary-judgment record with portions of the declarant's deposition. I will deny the motion to strike and grant the motion to supplement the record. I note, however, that the portions of the declaration and deposition that are the subject of the plaintiff's motion have not affected my decision on the motion for partial summary judgment.

negotiations with Ryder concerning its excess celery. On April 3, 2013, Ryder's representative, Bob Rasmussen, sent an email to Leach's representative, MaryBeth Yonke, containing a proposal for processing and storing diced celery. Ryder proposed to "receive celery for blanching and freezing" between approximately mid-September and the end of October. The email stated that "two million pounds will be processed," but that "[f]inal volumes will be confirmed after [Leach's] customers commit for 2013 by April 15th." This was apparently a reference to the fact that Leach's customers enter contracts to purchase Leach's celery before the planting season begins, and thus Leach can determine how much celery it will need to grow and process during the season by mid-April. Ryder's email further stated that "[a]fter processing and freezing, the toted product will remain in storage at Ryder until shipped to your customers." The email listed prices for each of the services Ryder proposed to provide to Leach: blanching, freezing, handling, and storage. See Younke Decl. Ex. 1.

In response to Rasmussen's email, Yonke inquired whether the quoted prices included the cost of testing the processed celery for the presence of certain microorganisms, including bacteria in the Listeria genus. Rasmussen stated that the cost of such testing was included. Yonke then sent an email in which she stated, among other things, that Leach "would like to accept your offer on freezing/blanching/storage charges for 2,000,000 pounds of finished IQF [individually quick-frozen] diced celery for the 2013 season." Yonke Decl. Ex. 2.

Following Leach's acceptance of Ryder's offer, Ryder sent a written agreement to Leach for signature. The agreement consisted of three different documents. The first document bore the heading "Leach Farms, Inc. Pricing Agreement," and appeared to have

2

been drafted from scratch. The document listed various "assumptions" about how the celery would be received, processed, stored, and shipped. It also listed rates for each of the services Ryder would be providing: "handling" at a rate of $7.14 per tote, "storage" at a rate of $7.14 per tote per month, "blanching" at a rate of $1.77 per hundred pounds, and "IQF freezing" at a rate of $7.71 per hundred pounds. The document contained space for signatures in which Ryder was identified as the "warehouseman" and Leach was identified as the "depositor." See Rasmussen Decl. Ex. A at 2–3.

The second document bore the heading "Attachment 1 to Warehouse Storage Agreement, Contract Terms and Conditions." Id. at 4–6. This document contained boilerplate terms in small print. The terms related to storage and handling of goods, and the parties were identified as "warehouseman" and "depositor." Included in the terms were provisions relating to liability for "loss or injury to goods stored." Id. § 11(a). One such provision purported to disclaim liability for lost profits and consequential damages:

> 13. No Liability For Consequential Damages
>
> Warehouseman shall not be liable for any loss of profit or special, indirect, or consequential damages of any kind, regardless of the legal theory on which such damages are based and regardless of whether warehouseman has been advised of the possibility of such damages.

Id. § 13 (all-caps removed).

The third document bore the heading "Ryder Refrigerated Warehousing" and contained more boilerplate terms. Id. at 7. However, the font size in this document differed from the other terms, and Ryder was referred to as the "company" rather than as the "warehouseman." These terms, like the terms in the second document, related mostly

to the storage and handling of goods, but in addition the terms included rates for freezing and cooling goods.

After Leach received Ryder's written agreement, it asked Ryder to include a provision memorializing Ryder's agreement to test the processed celery for microorganisms. Ryder included such a provision in the portion of the contract that was drafted from scratch, and once it did so both Leach and Ryder signed the agreement.

Between August 28 and September 12, 2013, Leach tendered approximately one million pounds of diced celery to Ryder for processing and storage. Ryder completed processing this celery on September 13, 2011, and had the celery tested for the presence of microorganisms. Much of this celery (specifically, nineteen of twenty-six 40,000 pound loads) tested positive for Listeria. When Ryder informed Leach of the positive test results, Leach alleged that Ryder was responsible for contaminating the celery. Representatives from Leach and Ryder then met to discuss the matter, but they were unable to agree on how to proceed.

Leach decided that, in light of the positive test results in the first million pounds of celery and Ryder's refusal to take additional measures to protect against Listeria contamination, it could not sell the processed celery to its customers or send the remaining million pounds of celery to Ryder for processing. Leach had no alternative means for processing the remaining million pounds, and therefore it decided to plow the celery under rather than incur the expense of harvesting it.

Under the contracts Leach had entered into at the beginning of the season, Leach was responsible for delivering two million pounds of celery to its customers at a price of thirty-eight cents per pound. Because it intended to use celery that had been processed

4

by Ryder to fulfill those contracts, Leach had to purchase replacement processed celery from other sources. Leach purchased some replacement celery on the spot market at a price of forty-seven cents per pound, which caused Leach to realize a loss on its transactions with its customers.

At the beginning of this year, Leach commenced the present action for breach of contract against Ryder. It alleges that Ryder promised to process two million pounds of Leach's celery and to ensure that, after processing, the celery would test negative for Listeria. Leach alleges that Ryder breached this contract by failing to ensure that the first million pounds did not test positive for Listeria and by failing to give Leach assurances that the second million pounds of celery, if tendered to Ryder, would not test positive for Listeria.

Ryder has filed a motion for partial summary judgment. In that motion, Ryder does not raise the issue of whether it is liable for breach of contract for failing to ensure that the celery did not test positive for Listeria. Instead, it argues that even if it did commit breach of contract in failing to ensure that the celery did not test positive for Listeria, Leach is not entitled to recover lost profits. Ryder also argues that it is not entitled to damages in connection with the second million pounds of celery, which Leach never tendered to Ryder for processing.

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable

juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

**A.      Liability for Lost Profits**

Ryder moves for summary judgment on the question of whether § 13 of the warehousing terms bars Leach from recovering lost profits. However, Ryder's stance on what constitutes lost profits is confusing. In its opening brief, Ryder concedes that the contract allows Leach to recover "the market value of the processed celery it contracted for." Ryder Br. at 10. Ryder's argument—that Leach is not entitled to recover lost profits but is entitled to recover the market value of the celery—implies that the market value of processed celery does not include any element that could be described as profit. Yet, if the costs Leach incurred in producing the celery were less than the celery's market value, Leach would have earned a profit when it sold the celery at market value. So Ryder seems to concede that, if Leach's costs of production were less than the market value of the processed celery at the time of the alleged breach, Leach would not have to take a reduction in damages to account for lost profits. But then in its reply brief, Ryder contends that Leach is not entitled to recover lost profits that are "embedded in the value" of the celery. Ryder Reply Br. at 3. This seems to be a retraction of Ryder's concession in its opening brief that Leach is entitled to recover the market value of the celery. Yet Ryder does not, in its reply brief, explicitly retract that concession or identify any methodology for subtracting lost profits that are embedded in the value of the celery. Is Ryder proposing to limit Leach's damages to the costs it incurred in planting, harvesting, and paying Ryder to process the celery? If so, it does not explicitly say so or show how the contractual exclusion of lost profits leads to that result.

6

Perhaps what Ryder means to argue is that the market value of the celery cannot be measured by the price that Leach's customers had agreed to pay for it. See Reply Br. at 6 (arguing that damages depending on the "sale of the celery at issue to third parties in collateral transactions" are not recoverable). But the price that third parties agreed to pay for the celery in arm's length transactions seems to be the best measure of the celery's market value, and Ryder does not suggest any other method for measuring the celery's value. The only other method I can think of is to use the spot price for celery at the time of the alleged breach. But I don't think Ryder wants to use that price, which seems to have been forty-seven cents—higher than the price Leach's customer's had agreed to pay.

Adding to the confusing nature of Ryder's argument is the fact that the warehousing terms explicitly state that the value of the celery is sixty cents per pound. See Rasmussen Decl. Ex. A § 11(d). So far, Leach has claimed that it is entitled to damages of either thirty-eight cents per pound or forty-seven cents per pound. Thus, even if Ryder is successful in showing that the disclaimer of liability for lost profits applies, it seems that Leach's damages would not have to be reduced, as the contractual "value" of the celery is sixty cents.

Because Ryder does not clearly identify what it thinks lost profits are or how Leach's damages would be calculated after lost profits are excluded, I cannot grant summary judgment to Ryder on the question of whether Leach is barred from recovering lost profits. If I entered an order stating that Leach was barred from recovering lost profits, what would I be precluding Leach from recovering? Could Leach recover the market value of the celery, as Ryder argued in its opening brief? If so, how would market value be determined? Could Leach recover sixty cents per pound, as provided in § 11(d) of the

7

warehousing terms? These would be open questions even if I entered an order stating that Leach was barred from recovering lost profits. Therefore, Ryder's motion for partial summary judgment on this issue will be denied.

**B.     Liability for Celery Not Processed**

Ryder also moves for summary judgment on the issue of its liability for damages attributable to the second million pounds of celery, which Leach did not tender to Ryder for processing. Ryder contends that no provision of the parties' agreement required it to process any specific volume of celery.

Initially, I note that whether or not Ryder had promised to process two million pounds of celery, Leach did not want Ryder to process the second million pounds of celery unless Ryder took extra steps to protect against Listeria contamination. See Zander Decl. ¶¶ 14–21. But unless the contract required Ryder to take those extra steps, Ryder's refusal to do so could not give rise to liability for breach of contract. So one issue with respect to the second million pounds is whether the parties' contract required Ryder to do more than it did to protect against Listeria contamination. Ryder has not moved for summary judgment on that issue.

Now, if Ryder had no obligation to process the second million pounds of celery in the first place, then of course it could not be liable for refusing to take extra steps to protect against Listeria contamination with respect to that celery. And Ryder contends that, because the agreement does not contain a promise to process two million pounds of celery, Ryder cannot be liable for breach of contract with respect to the second million pounds. However, from the fact that the contract does not contain a promise to process two million pounds of celery, it does not follow that Ryder could have refused to accept any

8

celery that Leach actually tendered for processing and storage in accordance with the terms of the contract. One of the "assumptions" stated in the written contract is that Leach would tender up to two loads per day of celery between early September and October. See Rasmussen Decl. Ex. A at 2. This implies that Ryder was required to accept up to two loads of celery per day during that time period. Moreover, the warehousing terms indicate that Ryder could reject "goods tendered for storage or other services" only if the goods did not conform to a written description, which presumably means only if the celery did not conform to the assumptions stated in the first part of the contract (being packed in totes, etc.).[2] Id. at § 1(b). Thus, if Leach actually tendered the second million pounds of celery to Ryder, and that celery conformed to the assumptions stated in the first part of the contract, Ryder would have been required to process it in accordance with the terms of the contract.[3] If one of the terms of the contract required Ryder to take extra steps to protect against Listeria contamination, then Ryder's refusal to take those steps would constitute breach of contract.

Accordingly, Ryder's motion for summary judgment with respect to the second million pounds of celery will be denied.

---

[2] The terms also state that Ryder could reject goods if Leach did not accept the terms of the agreement in writing, but that is not applicable here, as Leach signed the pricing agreement and initialed the warehousing terms.

[3] Ryder points out that it notified Leach on October 4, 2013, that it was cancelling the contract. However, the contract provides that a notice of termination does not take effect for thirty days. See Rasmussen Decl. Ex. A § 1(c). Leach would have tendered the second million pounds of celery during the month of October. Thus, Ryder's notice of termination does not affect its liability for breach of contract with respect to that celery.

## III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that Ryder's motion for partial summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Leach's motion to strike is **DENIED** and that its motion to supplement the record is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 28th day of August, 2014.

                                s/ Lynn Adelman
                                _____
                                LYNN ADELMAN
                                District Judge